UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

CHRISTOPHER CUELLAR,                      :

                Plaintiff,        :            11-cv-3632 (NSR)

    -against-                             :

                                :            MEMORANDUM OPINION

POLICE OFFICER LOVE #93/1934, POLICE      :            AND ORDER

OFFICER RUGGIERO #43/1906, POLICE         :

OFFICERS JOHN DOES NUMBERS 1-6, and       :

THE CITY OF WHITE PLAINS                   :

                                :

                Defendants.        :

-------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

      Plaintiff Christopher Cuellar ("Plaintiff") commenced the instant action against the City

of White Plains ("City"), White Plains Police Officers Maurice Love ("Love") and Domenico

Ruggiero ("Ruggiero") (collectively "Defendants"), and unidentified John Doe police officers

("the Does"), under 42 U.S.C. §§ 1983 and 1988 alleging a violation of his Federal and State

rights to be free from unreasonable seizures, and alleging related state law claims.  Specifically,

Plaintiff's complaint alleges (1) a federal false arrest and excessive force claim against Love,

Ruggiero, and the Does; (2) federal and state false arrest and failure to intervene claims against

Love, Ruggiero, and the Does; (3) a federal excessive force, failure to intervene, and conspiracy

to use excessive force claim against Love, Ruggiero, and the Does; (4) a *Monell* claim against

the City for (i) exhibiting deliberate indifference to violations of constitutional rights, (ii) failing

to properly screen, hire, train, supervise, and discipline police officers, and (iii) authorizing and

ratifying a police code of silence; (5) a state negligent hiring, training, and supervision claim

against the City; (6) a state "assault and battery" claim against Love, Ruggiero, and the Does;

and (7) a state intentional infliction of emotional distress claim against Love, Ruggiero, and the

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4|11|2014

Does.

Defendants now move, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment, asserting that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law.  Defendants aver that there was probable cause to arrest Plaintiff because he pled guilty to disorderly conduct; there is no admissible evidence that Love participated in the alleged excessive use of force; Love did not have a reasonable opportunity to intervene; the failure to intervene claim against Ruggiero merges with the excessive force claim; officers of the same corporate entity acting within the scope of their employment cannot legally conspire together; there is no evidence of a municipal policy, custom, or practice that allows constitutional violations; there is no evidence demonstrating the City's negligence in hiring, training, or supervising officers; there is no evidence that Plaintiff feared imminent bodily contact; there is no evidence Love caused Plaintiff's injuries; the intentional infliction of emotional distress claim cannot be used as a substitute for other available tort theories; and there is no evidence of severe emotional distress or extreme and outrageous conduct.  Defendants assert further that the three-year statute of limitations for § 1983 actions has run for claims against the Does.  For the following reasons, Defendants' motion is granted in part and denied in part.

## I. THE FACTS

The facts are gleaned from the parties' 56.1 statements,[1] affidavits, and exhibits submitted with this motion and the pleadings, and are not in dispute except where noted.

Love, an African American man, was hired by the White Plains Police Department

---

[1] The parties failed to follow the Court's individual rules of practice with respect to Rule 56.1 statements and counterstatements of material facts, (Rule 3.G.iii.).

("WPPD") in 2007.  He spent twenty weeks at the Westchester County Police Academy, followed by five weeks being trained by the WPPD in-house.  Love spent the next ten to twelve weeks assigned to field training officers learning how calls were handled and paperwork was done.  He then joined the Neighborhood Conditions Unit for the remainder of his first year on the force, where he was trained to handle violations of open container laws, public urination, and similar violations.  After the first year, he was assigned to a regular single-officer patrol car. This assignment has continued at least through February 2013.

Ruggiero, a white man, testified he served as a state court security officer from approximately 1998 through the end of 2005.  He was hired by the WPPD and re-attended the police academy from January through May 2006, studying, among other topics, law, policies, procedures, tactics, use of firearms, and receiving vehicle training.  There was also training regarding the use of force to effect arrests when individuals were resisting.  Ruggiero, like Love, received additional in-house training by the WPPD and was assigned to the Neighborhood Conditions Unit prior to assuming duties on regular patrol.

In addition to regular patrol assignments, the WPPD would hire "anywhere up to four police officers" to work the so-called bar overtime patrol ("Bar Patrol") on certain nights.  (Pl.'s Ex. D ("Ruggiero Dep.") 29:14-20.)  The Bar Patrol focused its activities on one block of Mamaroneck Avenue in White Plains, New York, between Post Road and Maple Avenue, where there is a high concentration of bars.  According to Ruggiero's deposition, there would be four officers and one sergeant working each Bar Patrol night, with two officers patrolling the east sidewalk and the other two patrolling the west sidewalk.  Officers would sometimes walk through certain bars, if ordered to do so.  The sergeant would stay on the street and maintain radio communication with the officers, advising them of situations that needed to be handled.

3

The Bar Patrol shift generally ran from about midnight through 4:30 a.m.  Ruggiero testified that sometimes only two or three officers worked Bar Patrol, but that there would never be just one officer patrolling the sidewalk by himself.  Love and Ruggiero were assigned to the Bar Patrol on June 27, 2010.

Plaintiff is a resident of Cortlandt Manor, New York.  On the evening of June 26, 2010, Plaintiff, his girlfriend Ashley Domicini ("Ashley"), and two other friends, Anthony Fortuna and Jamie Godal, met at Plaintiff's house.  Plaintiff drank one or two bud lights at his house before he and his friends left around 10:30 p.m.  They first drove to pick up another friend, Cindy Yee, and then continued on to Mamaroneck Avenue in White Plains.

Plaintiff and his friends entered an establishment called the Brazen Fox on the eastern side of Mamaroneck Avenue at approximately 11:15 p.m.  Plaintiff testified that he drank one beer there.  After about 45 minutes, the group left the Brazen Fox and entered an adjacent bar called the Porter House.  Plaintiff testified that he drank two beers at the Porter House and stayed there about 60 or 90 minutes, into the early morning hours of June 27, 2010.  Plaintiff, Jamie Godal, and Anthony Fortuna then left the Porter House through the back door and entered the back door of a third establishment, Elements.  At the time, Ashley was in the Porter House restroom and Cindy Yee went to find her.  The group planned to meet back up on the sidewalk on the eastern side of Mamaroneck Avenue.

When Plaintiff arrived on the sidewalk, he initially could not find Ashley.  He soon saw her walking alone southbound along the sidewalk.  He ran up to Ashley, who seemed very upset with him, grabbed her, turned her around, and asked what was wrong.  Plaintiff placed his hands on Ashley's shoulders.  Love and Ruggiero testified that Plaintiff also backed Ashley into the doorway of a store.  Plaintiff testified that she was already facing him with her back to the

4

doorway.[2]  Ashley wanted Plaintiff to get off her, which, according to Plaintiff, was not a new

occurrence.  Love then warned Plaintiff to get his hands off Ashley.  Plaintiff complied, and

Ashley continued walking south down Mamaroneck Avenue along the eastern sidewalk.

      Ruggiero testified that he and Love monitored Plaintiff for a while but soon resumed their

general patrol, believing Plaintiff and Ashley had separated.  However, Ruggiero and Love were

soon advised that a man was pushing a woman around inside the Chase Bank.  The officers

walked to the bank, and Love observed Plaintiff and Ashley arguing near the bank.  Love and

Ruggiero testified that Love warned Plaintiff a second time, directing him to leave Ashley alone

and let her go home.  Plaintiff, without citation to any evidence, argues that there was no second

warning.  Ashley crossed to the western side of Mamaroneck Avenue to get a taxi.  The officers,

again believing there would be no further issues, walked back toward their patrol car which was

near the Porter House.  About three minutes later, Plaintiff joined Ashley across the street, where

he had observed two men speaking with Ashley.  An altercation with Love and Ruggiero ensued.

      Defendants aver that the altercation happened as follows.  Love and Ruggiero became

aware of an incident on the western sidewalk of Mamaroneck Avenue after Plaintiff pushed one

of the men on the shoulder.  Love and Ruggiero observed Plaintiff grab someone with his hands.

Love approached Plaintiff and told him he was under arrest, but Plaintiff began walking toward

an alley leading to where his friend parked.  Plaintiff told Love he was just going to go home,

and the struggle to arrest Plaintiff commenced.  Plaintiff grabbed Ruggiero's arms and was

pushing Ruggiero backwards while Love grabbed one of Plaintiff's legs.  An unidentified person

grabbed Plaintiff's other leg until they were able to get Plaintiff on the ground.  Then Love

attempted to handcuff Plaintiff, but he tucked his hands beneath his body.  Love and Ruggiero

---

[2] Plaintiff is five feet, ten inches tall, and at the time weighed about 200 pounds.  Ashley is five feet, one inch tall.

were eventually able to get Plaintiff's hands out from under his body and handcuff him.  They then brought Plaintiff to his feet and walked him to the police car.

Plaintiff asserts the following.  He placed a hand on one man's shoulder in a friendly manner.[3]  Love yelled "hey" or "hey you" at him, but never said he was under arrest.  (Pl.'s Ex. B ("Pl. Dep.") 53:21-23.)  Plaintiff asserts in his Rule 56.1 counterstatement that he was handcuffed before telling Love he was just going to go home, and that he was tackled and cuffed without warning.  He asserts he was handcuffed without resistance but was nonetheless taken to the ground.[4]  Ruggiero called Plaintiff derogatory names such as "faggot" and "pussy."  (Pl. 50-h 38:6-7.)  Plaintiff testified to being held face down on the ground for about three minutes.  At some point during those three minutes, Ruggiero allegedly took Plaintiff's head and smashed his face to the ground and asked Plaintiff how he liked it.  Ruggiero and Love then helped Plaintiff to his feet and walked him to the police car.  On the way there, Ruggiero was telling Plaintiff he was Ruggiero's bitch and it made Plaintiff "feel as if [he] was on a leash like a dog."  (Pl. Dep. 78:15-22.)  Ruggiero leaned Plaintiff on his stomach against the car and then slammed Plaintiff to the ground.  Plaintiff's "whole front area" came into contact with the ground, but he denied that his face struck the ground again.  (Pl. Dep. 83:22-84:4.)

Plaintiff was charged with one count of resisting arrest in violation of New York Penal Law § 205.30 and one count of disorderly conduct in violation of New York Penal Law § 240.20(1).  On November 5, 2010, Plaintiff pled guilty to two counts of disorderly conduct in satisfaction of the charges.  Before his guilty plea, on or about September 10, 2010, Plaintiff

---

[3] Plaintiff testified at the 50-h hearing that he pushed the man on the shoulder but "not rough."  (Pl.'s Ex. A ("Pl. 50-h") 32:9-11.)

[4] At the 50-h hearing, Plaintiff said that after pushing the stranger, he turned and started to walk away, got into the alleyway, and the next thing he knew he was handcuffed.  He stated, "The cops said hey, they yelled, and I was like officer I am just going to go home, and I was tackled."  (Pl. 50-h 33:6-16.)

served a notice of claim on the City.  On February 24, 2011, the City conducted Plaintiff's 50-h

hearing.  Plaintiff brought the instant action on May 27, 2011.

## II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil

Procedure.  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the

absence of any genuine dispute or issue[5] of material fact by pointing to evidence in the record,

"including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P.

56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact,"

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion

that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce

admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has fulfilled its preliminary burden, the onus shifts to the

nonmoving party to raise the existence of a genuine dispute of material fact.  Fed. R. Civ. P.

56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  A genuine dispute of

material fact exists when "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party."  *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36

(2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d

Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Jeffreys v. City of New*

---

[5] The Court uses "issue" and "dispute" interchangeably.  Former Rule 56(c) and case law prior to the 2010 amendment used the term "issue," whereas the 2010 amendment substituted the term "dispute" because it "better reflects the focus of a summary judgment determination."  Fed. R. Civ. P. 56 advisory committee's note on 2010 amendments.

*York*, 426 F.3d 549, 553 (2d Cir. 2005).  Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)).  In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."), nor is it to determine a witness's credibility, *Anderson*, 477 U.S. at 249. Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

"[S]ummary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985); *see also ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 150 (2d Cir. 2007) ("[I]ntent is always a subjective matter of inference and thus rarely amenable to summary judgment." (quoting *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980))).  However, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

## III. CLAIMS AGAINST JOHN DOE DEFENDANTS

As an initial matter, Defendants assert and the Court agrees that all claims alleged against the Does must be dismissed. Claims under 42 U.S.C. § 1983 asserted in New York based on personal injuries, such as Plaintiff's claims premised on excessive force, are subject to a three-year statute of limitations. *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing N.Y. C.P.L.R. § 214); *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004). However, Plaintiff has not sought to replace the Does with named parties. *Cf. Hogan*, 738 F.3d at 517–19 (analyzing relation back of claims under Federal Rule of Civil Procedure 15(c)(1)(A), (C)). The claims for assault, battery, and intentional infliction of emotional distress against the Does likewise fail, as they are subject to a one-year statute of limitations. N.Y. C.P.L.R. § 215(3); *see also Yong Wen Mo v. Gee Ming Chan*, 17 A.D.3d 356, 358 (2d Dep't 2005); *Gallagher v. Directors Guild of Am., Inc.*, 144 A.D.2d 261, 263 (1st Dep't 1988).

## IV. EMBEDDED FALSE ARREST CLAIM

The first claim alleges that Love and Ruggiero "unlawfully seiz[ed]" Plaintiff, (Compl. ¶ 24), and the second claim alleges Plaintiff was subjected to an unconstitutional "deprivation of liberty," (*id.* ¶ 28). This amounts to a false arrest claim under § 1983, to which probable cause is a complete defense. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). "[A]n arrest is lawful if one charged crime on which a suspect is arrested is supported by probable cause, even if other charged crimes are not . . . ." *Id.* at 153 n.1 (explaining *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). A conviction or guilty plea conclusively establishes that probable cause existed and bars a § 1983 claim, *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Cameron v. Fogarty*, 806 F.2d 380, 388 (2d Cir. 1986); *Smith v. P.O. Canine Dog Chas*, No. 02 6240 KMW DF, 2004 WL 2202564, at *6, 2004 U.S. Dist. LEXIS 19623, at *18–20 (S.D.N.Y. Sept. 28, 2004); *Harvey v.*

9

*N.Y.C. Police Dep't*, No. 93 Civ. 7563 (JSR), 1997 WL 292112, at *1, 1997 U.S. Dist. LEXIS 7657, at *3–4 (S.D.N.Y. June 3, 1997), even if the conviction or plea is to a lesser charge, *Rodriguez v. Vill. of Ossining*, 918 F. Supp. 2d 230, 241 (S.D.N.Y. 2013); *Roundtree v. City of New York*, 778 F. Supp. 614, 619 (E.D.N.Y. 1991); *Keyes v. City of Albany*, 594 F. Supp. 1147, 1153, 1155 (N.D.N.Y. 1984).  This is true even if the plaintiff was convicted or pled guilty to disorderly conduct, which under state law is a violation under the Penal Law.  *See, e.g.*, *Rodriguez*, 918 F. Supp. 2d at 241 (guilty plea for disorderly conduct in satisfaction of resisting arrest charge barred § 1983 claim); *Roundtree*, 778 F. Supp. at 619 (guilty plea for disorderly conduct in satisfaction of cocaine possession charge barred § 1983 claim); *Keyes*, 594 F. Supp. at 1155 (guilty plea for disorderly conduct in satisfaction of criminal assault charge barred § 1983 claim).  Accordingly, Plaintiff's guilty plea to two counts of disorderly conduct in satisfaction of one count of resisting arrest and one count of disorderly conduct precludes him from arguing he was unlawfully seized.  Summary judgment must be granted to Love and Ruggiero as to the false arrest claim.  Plaintiff's reliance on *United States v. Toback*, No. 01 CR. 410 (RWS), 2005 WL 992004, at *4, 2005 U.S. Dist. LEXIS 6778, at *10 (S.D.N.Y. Apr. 14, 2005), which did not consider disorderly conduct to be a crime for purposes of sentencing guidelines calculations, is misplaced.

## V. EXCESSIVE FORCE

The Fourth Amendment, which guarantees the right to be free from unreasonable seizures, prohibits police officers from using excessive force in effecting an arrest.  *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Courts apply an objective reasonableness standard to determine whether the force used was excessive.  *Id.* (quoting *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005)).

10

Thus, "the inquiry is necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004)). To determine whether the force used was reasonable, courts consider "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect pose[d] an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396; *Papineau v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006)). The evidence is viewed "from the perspective of a reasonable officer on the scene," allowing for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (internal quotation marks and citations omitted).

In arguing that Love should be granted summary judgment for the excessive force and failure to intervene claims, Defendants assert that Love had no personal involvement in causing Plaintiff's injuries and that Love did not have a realistic opportunity to intervene. Defendants also assert that the failure to intervene claims fail against Ruggiero because he is the one identified as the primary actor allegedly violating Plaintiff's constitutional rights. Defendants assert further that the cause of action for conspiracy to use excessive force embedded within the third claim fails because police officers of the same municipality acting within the scope of their employment are legally incapable of conspiring together.

### A. Personal Involvement

It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite for an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).  "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Russo v. DeMilia*, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012) (quoting *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003)).

### 1. Direct Participation

Defendants assert that Love did not participate in either purported assault of which Plaintiff complains.  According to Plaintiff's own testimony, the "white officer" (i.e., Ruggiero) bashed his face into the ground after he had been subdued for a few minutes, and later the "white officer" threw Plaintiff back onto the ground.  Certainly, as to these two incidents, there is no evidence Love was a direct participant.  Accordingly, to the extent the excessive force claims are premised on Love's direct participation in these alleged instances, summary judgment must be granted.

However, Love does admit to having grabbed one of Plaintiff's legs to help bring Plaintiff to the ground during the initial struggle to arrest him.  Because the parties present conflicting testimony concerning the sequence of events preceding and immediately following the handcuffing of Plaintiff, there exists a genuine dispute of material fact concerning whether Plaintiff was actively resisting arrest and, therefore, whether Love and Ruggiero used excessive force.  *See Tracy*, 623 F.3d at 96.  Thus, the issue of whether excessive force was used to

handcuff Plaintiff cannot be resolved as a matter of law, and summary judgment in Love's favor is inappropriate.

Defendants further contend that the last incident, where Ruggiero purportedly leaned Plaintiff against the police car and then slammed him to the ground, is not actionable against Ruggiero because Plaintiff admitted he received no injuries.  To succeed on an excessive force claim, "a plaintiff generally must prove he sustained some injury . . . ."  *Ragland v. City of Mount Vernon*, No. 11 CV 1317 (VB), 2013 WL 4038616, at *6, 2013 U.S. Dist. LEXIS 114945, at *14 (S.D.N.Y. July 12, 2013) (citing *McAllister v. N.Y.C. Police Dep't*, 49 F. Supp. 2d 688, 699 (S.D.N.Y. 1999)).  However, "an injury need not be serious in order to give rise to a constitutional claim."  *Sash v. United States*, 674 F. Supp. 2d 531, 539 (S.D.N.Y. 2009) (quoting *Ortiz v. Pearson*, 88 F. Supp. 2d 151, 160 (S.D.N.Y. 2000)).  In *Ragland*, the court found that the plaintiff's description of how officers grabbed him by the neck, pushed him against a fence, and took him to the ground was sufficient to raise a triable issue of fact as to whether excessive force was used because there was sufficient evidence that would allow a jury to conclude the plaintiff had suffered some injury.  2013 WL 4038616, at *6, U.S. Dist. LEXIS 114945, at *15 (citing *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987)).  Thus, summary judgment motion was denied.  *Id.*  The instant case is similar.  At Plaintiff's deposition, when asked whether he sustained any injuries at that time, Plaintiff responded, "I don't know."  (Pl. Dep. 86:25-87:4.)  When asked whether his head hit the pavement, Plaintiff responded, "At that point that I knew of, no."  (Pl. Dep. 87:5-8.)  However, when asked what parts of his body hit the pavement, Plaintiff replied, "My whole front area."  (Pl. Dep. 83:22-25.)   A reasonable jury could find that Plaintiff was injured, even if just minimally, as a result of being slammed to the ground.  *Cf. Ragland*, 2013 WL 4038616, at *6.  Accordingly, summary judgment in favor of Ruggiero for

13

this body slamming incident must also be denied.

### 2. Failure to Intervene

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  For an officer to be held liable, he or she must have had a realistic opportunity to intervene to prevent the violation from happening.  *Id.* (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir. 1988)); *accord Russo v. DeMilia*, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012).  "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."  *Id.*  Of course, where the officer is a direct participant in the allegedly excessive use of force, the failure to intervene theory of liability is inapplicable.  *See Simon v. City of New York*, No. 09-CV-1302 (ENV) (RER), 2011 WL 317975, at *12, 2011 U.S. Dist. LEXIS 9515, at *39–40 (E.D.N.Y. Jan. 3, 2011) (citing *Morgan v. Cnty. of Nassau*, 720 F. Supp. 2d 229, 240 (E.D.N.Y. 2010)).

Here, Ruggiero was allegedly a direct participant in all three instances: tackling Plaintiff to the ground, bashing Plaintiff's face into the ground, and slamming Plaintiff to the ground.  *Cf. Anderson*, 17 F.3d at 557.  Thus, summary judgment in Ruggiero's favor must be granted on the failure to intervene portions of the second and third claims.  Likewise, Love was a direct participant in the initial instance where both Ruggiero and Love tackled Plaintiff to the ground. Thus, summary judgment must be granted to Love for this instance.

Regarding Love's ability to prevent the face bashing, Plaintiff testified that he did not initially make "heavy" or "violent" contact with the ground when tackled.  (Pl. Dep. 68:12-17.)

14

Plaintiff also testified he was on the ground for about three minutes, during which time Ruggiero was standing beside him speaking to him before bashing his face into the sidewalk.  Plaintiff did not testify that after being tackled the struggle continued unabated for three minutes.  Nothing in Plaintiff, Love, or Ruggiero's testimony otherwise suggests that Love was or should have been aware Ruggiero was about to grab Plaintiff's head and bash his face on the sidewalk before it happened.  *Cf. O'Neill*, 839 F.2d at 11.  The mere fact that Ruggiero was standing around for a few minutes, even while allegedly calling Plaintiff names, is insufficient to allow a reasonable jury to determine that Love had a realistic opportunity to prevent Ruggiero from suddenly bashing Plaintiff's face into the ground.  Accordingly, summary judgment must be granted to Love for this incident, as there was no realistic opportunity to intervene.  *Anderson*, 17 F.3d at 557.

As to the subsequent body slamming, however, under Plaintiff's version of the facts, Love was on notice that Ruggiero had already used excessive force.  Thus, Love had a duty to prevent further violations but apparently did not.  Because a reasonable jury could conclude that Love had a realistic opportunity to prevent this incident, summary judgment in Love's favor must be denied.

### B. Conspiracy to Violate Constitutional Rights

To succeed on a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate "(1) an agreement between two or more state actors or between a state actor and a private entity[] (2) to act in concert to inflict an unconstitutional injury[,] and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  A conspiracy claim fails, however, where allegations are conclusory.  *Id.*; *Paige v. City of N.Y. Corr. Dep't*, 798 F. Supp. 2d 508, 510 (S.D.N.Y. 2011).  Furthermore, "[u]nder the

'intracorporate conspiracy doctrine,' the officers, agents, and employees of a single corporate entity, each acting within the scope of [his or] her employment, are legally incapable of conspiring together." *Little v. City of New York*, 487 F. Supp. 2d 426, 441–42 (S.D.N.Y. 2007) (citations omitted); *see also Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (acknowledging, where trustees and faculty of educational corporation acted in their official capacities to terminate professor's employment, that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment"); *Paige*, 798 F. Supp. 2d at 510 (citing *Pangburn*, 200 F.3d at 72) (holding that conspiracy claim failed where it involved "only City Defendants who, as agents of the same municipal entity, cannot conspire among themselves").

Here, Defendants assert that the conspiracy allegations are conclusory and unsupported by evidence developed in discovery. The Court agrees. The complaint merely states that Defendants "conspired, aided, abetted and acted in concert" to use excessive force. (Compl. ¶ 38.) Plaintiff fails to address the conspiracy claim in his opposition altogether, nor does he cite any evidence demonstrating an agreement between Love and Ruggiero to use excessive force. Moreover, the intra-corporate conspiracy doctrine bars Plaintiff from asserting a conspiracy against Love and Ruggiero, both WPPD officers of the same municipal entity acting within the scope of their employment. *Paige*, 798 F. Supp. 2d at 510; *Little*, 487 F. Supp. 2d at 441–42. Accordingly, to the extent Plaintiff asserts within his third claim a conspiracy claim against Love and Ruggiero under § 1983, summary judgment must be granted.

16

**V. MUNICIPAL LIABILITY**

Because municipalities may not be held vicariously liable for the actions of their employees, a claim against a municipality must be premised on the theory that it maintained a policy, practice, or custom that caused the plaintiff's constitutional injury. *See Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipality. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (citation omitted). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries *beyond merely employing* the misbehaving officer." *Id.* (emphasis added) (citation omitted). Second, the plaintiff must establish a "'direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.'" *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 439 (S.D.N.Y. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)); *accord Abreu v. City of New York*, 657 F. Supp. 2d 357, 360 (E.D.N.Y. 2009) (quoting *City of Canton*, 489 U.S. at 385).

> To satisfy the first requirement, a plaintiff must prove the existence of either:
>
> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases). Although a plaintiff is not required to

17

identify an express rule or regulation to establish a *Monell* claim, proof of "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 127 (1988) (plurality opinion) (explaining that only municipal officials who have "final policymaking authority" concerning the particular activities giving rise to a plaintiff's claims "may by their actions subject the government to § 1983 liability").  "In the end, therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Hayes,* 853 F. Supp. 2d at 439 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotation marks omitted).

Here, Plaintiff alleges that the City was deliberately indifferent to his rights because it failed to properly screen, train, or supervise Love and Ruggiero and because the City ratified a code of silence whereby officers regularly covered up incidents of excessive force.  *Cf. Abreu*, 657 F. Supp. 2d at 360 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127–30 (2d Cir. 2004)) (allowing *Monell* claim against municipality that was "deliberately indifferent to the training, supervision, or discipline of its employees").  As to the "code of silence" allegation, which generally encompasses the failure to discipline allegation, there is no evidence to support the existence of a code of silence or the City's ratification thereof.  Plaintiff does not deign to argue otherwise.  Thus, summary judgment is proper as to that portion of the *Monell* claim.  To the extent Plaintiff seeks to hold the City liable for its failure to properly screen police officers—which amounts to "merely employing" the allegedly misbehaving officer—this theory of liability is not cognizable under *Monell*.  *Vippolis*, 768 F.2d at 44.  Thus, summary judgment must be

granted as to that portion as well.  The Court need only consider the inadequate training and supervision theories.

**A. Adequacy of Training**

"[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011).  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* (internal quotation marks and citation omitted).  There is ample evidence in the record that Love and Ruggiero were trained over many weeks to handle arrests and the use of force incident thereto.  Plaintiff notes, without citation to any evidence, that Love and Ruggiero testified they did not receive any supplemental or special training for conducting the Bar Patrol.  Plaintiff asserts such supplemental training is required because it is clear officers will interact with inebriated individuals, but cites no authority showing that inebriated individuals are so different from others with whom police come into contact on regular patrols that specialized training is required.  Significantly, Plaintiff points to no evidence of similar violations by purportedly untrained officers working the Bar Patrol.  *Id.*; *DeCarlo*, 141 F.3d at 61.  Thus, there is no evidence sufficient to create a genuine dispute of material fact on this issue, and there are no facts to support the existence of a policy, custom, or practice of inadequately training police officers.  Summary judgment in the City's favor is thus appropriate for the inadequate training theory of *Monell* liability.

**B. Adequacy of Supervision**

To hold a municipality liable under a failure to supervise claim, a plaintiff must demonstrate facts showing a constitutional violation and policymakers' reaction to it. *Amnesty Am.*, 361 F.3d at 127 n.8. "[D]eliberate indifference may be established by a showing that policymaking officials deliberately ignored an obvious need for supervision." *Id.* (citing *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). To show "policymakers were 'knowingly and deliberately indifferent to the possibility that its police officers were wont' to violate the constitutional rights of arrestees," *id.* at 127 (quoting *Fiacco v. City of Rensselaer*, 783 F.2d 319, 326 (2d Cir. 1986)), a plaintiff must show that "'the need for better supervision to protect against constitutional violations was obvious'" but the municipal policymakers "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct," *id.* (quoting *Vann*, 72 F.3d at 1049).

Here, the parties do not dispute any facts concerning supervision during the Bar Patrol. Defendants proffer testimony that officers serving on the Bar Patrol were supervised by a sergeant who was usually located on Mamaroneck Avenue during the entire shift. Ruggiero testified that the sergeant maintained contact with them by radio and sometimes would instruct them to conduct walk-throughs in establishments, to concentrate on areas with large crowds, or to respond to reported incidents. Plaintiff proffers no evidence to suggest that either Love, Ruggiero, or any other WPPD officer was "wont" to violate constitutional rights. Plaintiff also proffers no evidence suggesting that the supervision provided by the sergeant located on Mamaroneck Avenue was insufficient, much less that any such insufficiency "was the result of a 'conscious choice' rather than mere negligence." *Id.* at 128 (citing *City of Canton*, 489 U.S. at 389). The evidence shows that on regular shifts officers patrol on foot and in vehicles without

20

their sergeants being present.  Because Bar Patrol officers were under *more* supervision than the regular patrols—the sergeant was actually in the vicinity observing foot traffic on the street and directing officers to conduct walk-throughs and respond to situations—Plaintiff's argument that Bar Patrol officers were inadequately supervised because the sergeant did not conduct walk-throughs with the officers is meritless.  Plaintiff would have the sergeant holding officers' hands as they cross the street.  Thus, there are no facts to support the existence of a policy, custom, or practice of inadequately supervising police officers.  Accordingly, summary judgment must be granted as to the inadequate supervision theory of *Monell* liability and, therefore, on the entire *Monell* claim.

## VI. NEGLIGENT HIRING, TRAINING, AND SUPERVISION

### A. Negligent Hiring or Retention

In New York, an employer may be held liable for negligent hiring or retention where one of its employees caused injures to a third party "when the employer has either hired or retained the employee with knowledge of the employee's propensity for the sort of behavior *which caused the injured party's harm*."  *Borden v. Capital Dist. Transp. Auth.*, 307 A.D.2d 1059, 1061 (3d Dep't 2003) (quoting *Detone v. Courier Bullit Serv., Inc.*, 140 A.D.2d 278, 279 (1st Dep't 1988)).  Here the record is completely devoid of evidence demonstrating either Love or Ruggiero's propensity for any type of behavior, let alone propensity for violence and using excessive force.  *See Nouel v. 325 Wadsworth Realty LLC*, 112 A.D.3d 493, 494 (1st Dep't 2013).  Plaintiff merely argues that the same purported deficiencies in training discussed in the *Monell* claim form the basis for, *inter alia*, the negligent hiring claim, but does not discuss the hiring or continued retention of Love and Ruggiero.  Accordingly, summary judgment is appropriate for this claim.

21

### B. Negligent Training and Supervision

A municipality may be held liable for negligently training or supervising its law

enforcement officers.  *Barr v. Cnty. of Albany*, 50 N.Y.2d 247, 257 (1980).  As to Love and

Ruggiero's training, there is ample testimony describing both the length of time and the subject

matter of their training during the first year of their employment with the WPPD, despite

Plaintiff's assertions to the contrary.  *Cf. Rew v. Cnty. of Niagara*, No. 222 CA 13-01155, 2014

WL 1258305, at *2, 2014 N.Y. App. Div. LEXIS , at *5–6 (4th Dep't Mar. 28, 2014) (holding

summary judgment inappropriate for sheriff because defendants submitted "no evidence

establishing that the Sheriff was not negligent in training" deputies); *Moustaffa v. City of New

York*, 252 A.D.2d 472, 472 (1st Dep't 1998) (holding summary judgment inappropriate where

municipal defendant failed to offer any evidence of officers' training or of "whether such

training was the result of an informed, duly-considered municipal decision").  On the other hand,

Plaintiff argues without citation to evidence or case law that the Bar Patrol requires additional

training because it is materially different from other types of patrol duty due to the presence of

inebriated individuals.  Such conclusory allegations do not create genuine issues of material fact.

*Barr*, 50 N.Y.2d at 258; *Richardson v. N.Y. Univ.*, 202 A.D.2d 295, 296–97 (1st Dep't 1994).

As to the negligent supervision theory, the New York Court of Appeals has held that

sheriffs have no duty to be present every time deputies are performing law enforcement

functions.  *Barr*, 50 N.Y.2d at 258.  Likewise, it cannot be said that direct supervisors of police

officers must be physically present every time the officers perform these same functions, *id.*,

whether it be performing walk-throughs in the bars at night or effecting arrests while on patrol.

Plaintiff's assertions to the contrary are also conclusory and do not create genuine issues of

material fact.  *Id.*  Accordingly, as there are no genuine disputes of material fact, and as there is

no evidence to support Plaintiff's contentions that the City negligently trained and supervised Love and Ruggiero, summary judgment must be granted.

## VII. ASSAULT AND BATTERY

"Under New York Law, an 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001); *accord Stanley v. Amalithone Realty, Inc.*, 31 Misc. 3d 995, 1006 (Sup. Ct. N.Y. Cnty. 2011) (claim for assault exists where a person intentionally attempts or threatens to cause injury or commit a battery). To recover damages for assault, "there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Stanley*, 31 Misc. 3d at 1006 (citing *Holtz v. Wildenstein & Co.*, 261 A.D.2d 336, 336 (1st Dep't 1999)). Similarly, "a battery is an intentional wrongful physical contact with another person without consent," *Girden*, 262 F.3d at 203, "either personally or by means of an instrumentality," *Aberbach v. Biomedical Tissue Servs., Ltd.*, 48 A.D.3d 716, 718 (2d Dep't 2008).

To succeed on an assault or battery claim in the law enforcement context, a plaintiff must demonstrate that defendants' conduct "was not reasonable within the meaning of the New York statute concerning justification for law enforcement's use of force in the course of performing their duties." *Torres-Cuesta v. Berberich*, 511 F. App'x 89, 91 (2d Cir. 2013) (quoting *Nimely v. City of New York*, 414 F.3d 381, 391 (2d Cir. 2005)); *see* N.Y. Penal L. § 35.30(1). In either case, where an arrest is determined to be unlawful, any use of force may constitute an assault and battery. *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001) (citing *Johnson v. Suffolk Cnty. Police Dep't*, 245 A.D.2d 340, 341 (2d Dep't 1997) (holding that police officer committed battery by touching plaintiff during unlawful arrest)); *see also 5 Borough Pawn, LLC. v. Marti*, 753 F. Supp. 2d 186, 200–01 (S.D.N.Y. 2010) (noting material issue of

fact existed for assault claim where there were issues of fact concerning existence of probable cause).

Here, as discussed with the false arrest claim, Plaintiff's arrest was lawful.  Therefore, to defeat the instant motion for summary judgment, he must proffer evidence demonstrating the use of force was objectively unreasonable.  *Nimely*, 414 F.3d at 391.  As to the claim for civil assault, Defendants assert that Plaintiff has no evidence suggesting he was in apprehension or fear of imminent contact.  Plaintiff in response points to absolutely no evidence of his apprehension or fear, either before being tackled, before his face was allegedly bashed into the sidewalk, or before he was allegedly body slammed.  Thus, there is no genuine dispute of material fact on the issue of apprehension, and summary judgment must be granted to Love and Ruggiero on the assault claim.

As to the claim for civil battery, Defendants argue only that Love is entitled to summary judgment because there is no evidence he bashed Plaintiff's face into the ground or body slammed Plaintiff.[6]  For these two instances of conduct, summary judgment is appropriate because Plaintiff testified only that the "white officer" committed these acts.  However, because there are genuine issues of material fact regarding Love's involvement in the initial tackling and handcuffing of Plaintiff, summary judgment in Love's favor must be denied for that instance.

## VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993); *accord Capellupo v. Nassau*

---

[6] Defendants do not seek summary judgment for Ruggiero on the battery claim.

*Health Care Corp.*, 97 A.D.3d 619, 623 (2d Dep't 2012). To satisfy the first element, "the conduct [must] ha[ve] been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Howell*, 81 N.Y.2d at 122 (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303(1983)). To satisfy the second element, there must be evidence that "the defendant acted either (a) with the desire to cause such distress to plaintiff, (b) under circumstances known to defendant which made it substantially certain that [plaintiff would be distressed], or (c) recklessly and with utter disregard of the consequences." *Brewton v. City of New York*, 550 F. Supp. 2d 355, 369 (E.D.N.Y. 2008). To satisfy the fourth element, a plaintiff generally must support allegations of suffering from severe emotional distress with "medical evidence, not the mere recitation of speculative claims." *Walentas v. Johnes*, 257 A.D.2d 352, 353 (1st Dep't 1999), *cited in Roche v. Claverack Coop. Ins. Co.*, 59 A.D.3d 914, 918 (3d Dep't 2009) (affirming grant of summary judgment for intentional infliction of emotional distress claim "[d]ue to plaintiff's failure to present medical evidence of severe emotional distress"); *but see Plunkett v. NYU Downtown Hosp.*, 21 A.D.3d 1022, 1022–23 (2d Dep't 2005) (no medical evidence necessary where plaintiffs sought to recover from mental anguish caused by hospital's allegedly "unwarranted delay in notifying them of their father's death and its interference with their right to the possession of his remains"); *Garcia v. Lawrence Hosp.*, 5 A.D.3d 227, 227 (1st Dep't 2004) (quoting *Johnson v. New York*, 37 N.Y.2d 378, 382) (allegation of medical treatment or psychological counseling not essential to negligent infliction of emotional distress claim, where hospital did not supervise medically sedated mother breastfeeding newborn who fell asleep and smothered the baby, because there existed "especial likelihood of genuine and serious mental distress, arising from the special circumstances").

25

Defendants argue that a claim for intentional infliction of emotional distress cannot coexist where the conduct complained of can be redressed through traditional tort remedies. There is certainly substantial case law suggesting this to be true. *See, e.g.*, *Bender v. City of New York*, 78 F.3d 787, 791–92 (2d Cir. 1996) (collecting cases); *Dorn v. Maffei*, 386 F. Supp. 2d 479, 486 n.5 (S.D.N.Y. 2005); *Fischer v. Maloney*, 43 N.Y.2d 553, 557–58 (1978); *Leonard v. Reinhardt*, 20 A.D.3d 510, 510 (2d Dep't 2005); *see also Saldana v. Vill. of Port Chester*, No. 09 Civ. 6268 (SCR) (GAY), 2010 WL 6117083, at *5 (S.D.N.Y. July 21, 2010) (recommendation of magistrate judge to dismiss intentional infliction of emotional distress claim because it "cannot coexist with claims of excessive force, assault and battery"). According to the New York Court of Appeals, a claim would be barred "where the *conduct* complained of falls *well within the ambit* of other traditional tort liability." *Fischer*, 43 N.Y.2d at 558 (emphasis added).

Here, Plaintiff argues that he suffered physical and psychological injuries where he was arrested. The actions causing his physical injuries certainly fall "well within the ambit of" his battery claim. *Fischer*, 43 N.Y.2d at 558. The actions causing his alleged psychological injuries include the alleged physical abuse and verbal abuse from Ruggiero, some of which are not encompassed in the battery claim. While there is some overlap in the actions, the Court need not determine definitively whether Plaintiff's intentional infliction of emotional distress claim is duplicative, *cf. Bender*, 78 F.3d at 792, because Plaintiff has insufficient evidence of suffering severe emotional distress, *Roche*, 59 A.D.3d at 918. His purported psychological injuries, being embarrassed and humiliated in front of friends and being made to feel like a dog on a leash, do not amount to *severe* emotional distress. The medical evidence proffered deals with Plaintiff's broken nose, except for one notation made three days after his arrest that Plaintiff's "mother does not feel that he has had any mental status changes since the accident." (Pl.'s Ex. C.) As Plaintiff

proffers no other evidence showing he was emotionally distressed, *see Walentas*, 257 A.D.2d at 353, the motion for summary judgment must be granted.

## VI. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in part as follows: (1) all claims against John Doe defendants are dismissed; (2) Love and Ruggiero are granted summary judgment on the false arrest causes of action asserted in Plaintiff's first and second claims; (3) Love is granted summary judgment on Plaintiff's excessive force causes of action in the first and third claims which are based on Love's direct participation in the face bashing and body slamming incidents only, but not for his involvement in initially tackling and handcuffing Plaintiff; (4) Love is granted summary judgment on Plaintiff's failure to intervene causes of action in the second and third claims for the initial handcuffing and tackling scuffle and for the face bashing incident only; (5) Ruggiero is granted summary judgment on Plaintiff's failure to intervene causes of action in the second and third claims; (6) Love and Ruggiero are granted summary judgment on the conspiracy cause of action in the third claim; (7) the City is granted summary judgment on the *Monell* and negligence causes of action in the fourth and fifth claims; (8) Love and Ruggiero are granted summary judgment on the civil assault cause of action in the sixth claim; (9) Love is granted summary judgment on the battery cause of action in the sixth claim for the face bashing and body slamming incidents only, but not for his involvement in initially tackling and handcuffing Plaintiff; and (10) Love and Ruggiero are granted summary judgment on the intentional infliction of emotional distress cause of action in the seventh claim.  The motion for partial summary judgment is otherwise DENIED.

27

The Clerk of Court is respectfully directed to terminate this motion (Doc. 29), and to terminate the City of White Plains and Police Officers John Does Numbers 1-6 as defendants.


Dated:  April       11   , 2014                    SO ORDERED:
        White Plains, New York

                                                   _____
                                                   NELSON S. ROMÁN
                                                   United States District Judge

28